ATTORNEYS FOR APPELLANT
Ruth Ann Johnson
Marion County Public Defender Agency

Ellen M. O'Connor
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Michael Gene Worden
Deputy Attorney General
Indianapolis, Indiana



FILED
Feb 22 2012, 11:17 am

CLERK
of the supreme court,
court of appeals and
tax court

## In the
## Indiana Supreme Court

No. 49S05-1105-CR-267

JOEY ADDISON,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Marion Superior Court, No. 49G04-0812-MR-289345
The Honorable Lisa F. Borges, Judge

On Petition To Transfer from the Indiana Court of Appeals, No. 49A05-1006-CR-354

**February 22, 2012**

**Rucker, Justice.**

We grant transfer in this case to explore whether and to what extent a defendant's race-based Batson claim may be reviewed on appeal where at trial the defendant failed to rebut the State's proffered race-neutral reason for striking a black venireperson.

**Facts and Procedural History**

On the evening of December 19, 2008, in response to a noise he heard in front of his house, forty-year-old Joey Addison walked outside, found Gerrod Scott Scales walking near two parked cars in front of Addison's home, shot Scales fourteen times with two handguns, stated "Now what you motherf***ers think about that?," and turned and calmly walked back into his home – all while dressed in a tuxedo. Once inside, Addison sat down on the bed, placed the handguns beside him, and calmly came to the door minutes later when police arrived. Addison appeared "pretty spacey" to police after the shootings and told the interviewing detective he was "bullet proof." Tr. at 471. In subsequent interviews with court-appointed psychiatrists, Addison declared that the FBI had reprogrammed his brain and that he had been sending text messages to the FBI to inform them of his movements.

Until shortly before the shooting, Addison's neighbors knew him as a kind and outgoing person. He frequently socialized with his neighbors. He worked as a part-time security guard at a gas station and employed himself and neighborhood youth by doing construction, painting, mowing, and similar jobs. Addison graduated from high school, had earned 106 hours of college credit, and had no prior criminal record. Addison was a large man and kept his long hair braided, but those who knew him noticed a dramatic change in his appearance and behavior beginning in early to mid 2008. Over a period of several months, Addison lost approximately 120 pounds, shaved his head bald, stopped working, stopped eating, and stopped socializing with his friends and neighbors. He believed that the renters in the home across the street from him were keeping him under surveillance and that there were surveillance cameras in the street lamps outside his home. Addison believed there had been 75 attempts on his life between July and December of 2008, that he was hooked up to a lie detector machine, and that the FBI was sending him messages and instructions through daily events.

On December 22, 2008, the State charged Addison with Count I murder, and Count II carrying a handgun without a license. The State subsequently dismissed Count II after proof of Addison's valid handgun permit. On January 27, 2009, Addison filed a notice of insanity defense and the trial court appointed two psychiatrists to evaluate him. After delays largely attributable to a finding that Addison lacked present comprehension to assist counsel in his defense, jury selection for Addison's trial began on April 19, 2010. The venirepersons were questioned in groups of fourteen, and the parties made their strikes after each group had been questioned. Because "the issue of insanity might develop a lot of side issues," the trial judge allowed both sides flexibility concerning the normal time limit of thirty minutes per side for questioning of prospective jurors. Tr. at 9.

After both the prosecution and the defense had questioned the first panel of fourteen venirepersons, the parties approached the bench with their challenges to this group. On its own motion, the trial court excused one venireperson for cause. The State exercised its peremptory challenges to remove five venirepersons, three of which were against the only three African Americans on the panel – venirepersons Pettigrew, Henderson, and Turner. See Tr. at 89. Addison, an African American, lodged a Batson objection, noting that the State "just now struck all three blacks that were on the panel." Tr. at 88. The trial court temporarily excused the jurors to hear the parties' arguments. The State agreed "that there is a prima facie case of a pattern on the State's part and so the State is required to articulate a non-race specific reason" for the strikes. Tr. at 90. The State articulated reasons for the strikes, and Addison conceded that two of the strikes were permissible but argued the third was not. Tr. at 91. ("Judge, I'll give them the first two, Ms. Pettigrew and Mr. Henderson,[1] but there [is] absolutely no reason to cut Mr. Turner."). In explaining its reason for striking venireperson Turner, the State declared,

> And as for Mr. Turner, he indicated, when asked what he would like on making a determination (indiscernible) [on the insanity defense,] was he going to go by what the professionals say[?] And he – when asked what else would contribute to making his

---

[1] The record shows that a relative of venireperson Pettigrew had a pending criminal charge, and venireperson Henderson "acknowledged . . . bias against the State" because one of his relatives had a prior involvement with the State. Tr. at 90-91.

decision, he had trouble articulating anything other than, well, I'll just go by whatever the professionals say, which obviously in this case, would present a problem for the State.

Tr. at 91. Addison responded:

> There is – all of his other responses – it seemed to me that once they get – the State often does, once they get a question they don't like from a black juror, they fail to follow-up on that. I don't think there was any clear follow-up on that. When I asked the questions [on the insanity defense] of the – generally of the jurors to consider other factors, they seemed all in agreement. So I'll give him the first two, but I think they don't . . . state any race neutral reason on Mr. Turner.

Tr. at 92. When pressed by the trial court as to why its reason was race-neutral, the State replied,

> Because of what he said and the reason we removed him had absolutely nothing to do with his race. It had to do with the fact that when he's – when the question was put to him about how he's going to make a determination about – at the time we were talking about insanity, that generally we were talking about someone's ability to determine the wrongfulness of their actions. All he did was to articulate is, "Well, I'd just go with the doctors. I'd just go with the doctors." And could not add any more to his analysis or what he'd look at than that, which leaves the State extreme – extremely [sic] misgivings about somebody who has that much deference to the doctors, where as some other jurors articulated, you know, that's – it's just a piece – things to look at and went to other things right off the bat.

Tr. at 93. The trial court then declared, "Well, I do think the State's articulated race neutral reasons for striking all three jurors, so I'm going to deny the Batson motion." Tr. at 93-94.

The court then seated the remaining eight members of the panel as jurors. Voir dire of the second panel of fourteen venirepersons followed, and two of these were stricken for cause. The parties then exercised eight peremptory strikes, one of which was a prosecution strike against the only African American on the second panel, venireperson Swanigan. Addison lodged a Batson objection and the court again heard arguments outside the presence of the jury. The State explained that it had misgivings about venireperson Swanigan because he had previously

4

served as a juror in a homicide/feticide trial that resulted in a not guilty verdict. See Tr. at 137 ("I'm suspicious of any juror who[ ] acquitted in a jury trial . . . ."). Addison essentially replied that the reason was not race-neutral. See Tr. at 138-39 ("Judge, that is not a sufficient enough reason to strike this juror in the face of – the fact that three other jurors have now been stricken that are black."). After the arguments concluded, the trial court overruled Addison's objection to the strike of venireperson Swanigan. The trial court seated the remaining four panel members as jurors. A final group of seven venirepersons was then questioned, and the trial court seated two alternate jurors from that group, completing the jury selection process.

A two-day jury trial ensued. The evidence included testimony of the two psychiatrists appointed by the trial court to examine Addison. Both concluded that at the time of the offense, Addison suffered a mental disease that rendered him unable to appreciate the wrongfulness of his conduct. In essence they concluded Addison was insane. However the jury rejected his insanity defense and found Addison guilty but mentally ill. At the sentencing hearing, the trial court imposed the minimum sentence for murder: forty-five years in the Department of Corrections. Addison appealed raising two issues: (1) whether the trial court erred in denying his Batson challenge; and (2) whether the trial court erred in excluding from evidence the deposition of a defense witness. The Court of Appeals rejected the Batson claim but agreed the trial court erred in excluding the deposition from evidence. However, finding this error harmless, the Court of Appeals affirmed the judgment of the trial court in an unpublished memorandum decision. See Addison v. State, 49A05-1006-CR-354 (Ind. Ct. App. Feb. 16, 2011). Having previously granted transfer thereby vacating the opinion of the Court of Appeals, see Ind. Appellate Rule 58(A), we now reverse the judgment of the trial court with respect to Addison's Batson claim. We summarily affirm that portion of the Court of Appeals opinion concerning Addison's remaining claim. Additional facts are set forth below as necessary.

**Discussion**

A.    *The Batson Framework*

"Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." Batson v. Kentucky, 476 U.S. 79, 86 (1986). The exclusion of even a sole prospective juror based on race, ethnicity, or gender violates the Fourteenth Amendment's Equal Protection Clause. See Snyder v. Louisiana, 552 U.S. 472, 478 (2008).

A defendant's race-based Batson claim involves a three-step process. At the first stage the burden is low, requiring that the defendant only show circumstances raising an inference that discrimination occurred. See Johnson v. California, 545 U.S. 162, 170 (2005). This is commonly referred to as a "prima facie" showing. In this case the record shows that in the first round of voir dire, the State used its peremptory challenges to strike the only three African Americans on the venire panel. Over Addison's objection, the State acknowledged "that there is a prima facie case of a pattern on the State's part." Tr. at 90. The State's acknowledgment was certainly appropriate. Although the removal of some African American jurors by the use of peremptory challenges does not, by itself, raise an inference of racial discrimination, see Kent v. State, 675 N.E.2d 332, 340 (Ind. 1996), the removal of "'the only . . . African American juror that could have served on the petit jury' does 'raise an inference that the juror was excluded on the basis of race.'" McCormick v. State, 803 N.E.2d 1108, 1111 (Ind. 2004) (quoting McCants v. State, 686 N.E.2d 1281, 1284 (Ind. 1997)). See also Johnson, 545 U.S. at 173 (finding that striking all three African Americans in the venire was sufficient to constitute a prima facie case of discrimination). In this case Addison carried his burden of demonstrating an inference that purposeful discrimination occurred.[2]

---

[2] Even if Addison had not made a prima facie showing of purposeful discrimination the issue is now of no moment. Where, as here, the State offers a "race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing [of purposeful discrimination] becomes moot." Hernandez v. New York, 500 U.S. 352, 359 (1991) (plurality opinion).

At the second stage, if the first stage showing has been satisfied, then the burden shifts to the prosecution to "offer a race-neutral basis for striking the juror in question." Snyder, 552 U.S. at 477 (quoting Miller-El v. Dretke, 545 U.S. 231, 277 (2005) (Thomas, J., dissenting)). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Purkett v. Elem, 514 U.S. 765, 768 (1995) (per curiam) (quoting Hernandez, 500 U.S. at 360). Although the race-neutral reason must be more than a mere denial of improper motive, the reason need not be particularly "persuasive, or even plausible." Id.

Here, the State explained that it exercised its peremptory strike of venireperson Turner because, according to the State, Turner essentially said that he would simply follow the recommendation of the health care professionals on the question of the insanity defense. This of course was of particular concern to the State because both doctors would later testify that Addison was insane at the time of the offense. And this Court has noted that expert opinion is not dispositive on the question of insanity. See Thompson v. State, 804 N.E.2d 1146, 1150 (Ind. 2004) (affirming defendant's conviction of guilty but mentally ill notwithstanding that all the experts who examined the defendant were of the opinion that defendant was insane at the time of the crime). Accord Barany v. State, 658 N.E.2d 60, 63 (Ind. 1995) (noting that the trier of fact is free to disregard the unanimous testimony of experts and rely on conflicting testimony of lay witnesses). An explanation that a venireperson has expressed an unwillingness to be fair to one side or another is facially race-neutral. See Highler v. State, 854 N.E.2d 823, 827-28 (Ind. 2006) (declaring that prosecutor's explanation that statements juror made in his questionnaire and during voir dire raised questions about juror's ability "to be fair and impartial to the State" was facially race-neutral). In sum, the State carried its burden of offering a race-neutral reason for striking venireperson Turner.

At the third and last stage of a Batson inquiry, "in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." Snyder, 552 U.S. at 477 (quoting Miller-El, 545 U.S. at 277 (Thomas, J., dissenting). Accord Jeter v. State, 888 N.E.2d 1257, 1263 (Ind. 2008). Although the burden of persuasion on a Batson challenge rests with the party opposing the strike, Jeter, 888 N.E.2d at 1264, the third step – determination of discrimination – is the "duty" of the trial judge. See Miller-El, 545 U.S. at 239

7

(quoting Batson, 476 U.S. at 98); Jeter, 888 N.E.2d at 1264.  The trial court evaluates the persuasiveness of the step two justification at the third step.  It is then that "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination."  Purkett, 514 U.S. at 768.  The issue is whether the trial court finds the prosecutor's race-neutral explanation credible.  "[T]he rule in Batson provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it."  Miller-El, 545 U.S. at 251-52 (citations omitted).  Also, at the third stage, the defendant may offer additional evidence to demonstrate that the proffered justification was pretextual.

Here, in response to the State's explanation, Addison essentially complained that he did not think the explanation was race-neutral.  But he offered nothing to substantiate his position other than to say that the State did not "follow-up" on its questioning of Turner.  Tr. at 92.  And Addison did not explore how or why failing to "follow-up" was evidence of pretext.  However, it is not at all clear that the trial court properly discharged its third-stage duty of determining whether Addison had shown purposeful discrimination.  For example the trial court did not indicate whether or why it found the State's proffered explanation credible.  Although at least one federal circuit court has declared "federal law has never required explicit fact-findings following a Batson challenge, especially where a prima facie case is acknowledged and the prosecution presents specific nondiscriminatory reasons on the record," Stenhouse v. Hobbs, 631 F.3d 888, 893 (8th Cir. 2011) (quoting Smulls v. Roper, 535 F.3d 853, 860 (8th Cir. 2008) (en banc)), nonetheless by simply declaring, without more, that the State "articulated race neutral reasons for striking all three jurors," Tr. at 93-94, the trial court appears to have combined stages two and three of the Batson inquiry.  This was incorrect.  "The analytical structure established by Batson cannot operate properly if the second and third steps are conflated."  United States v. Rutledge, 648 F.3d 555, 559 (7th Cir. 2011) (remanding cause to the trial court for an explicit step-three credibility finding to support its decision denying a Batson challenge).  In any event other than essentially contending that the State's explanation was pretextual Addison offered the trial court no reason to cast doubt on the State's explanations for the strike.  And without any specific objections or further evidence from Addison, the trial court accepted the State's reasons for striking juror Turner as legitimate and race-neutral.

On appeal however Addison advances a slightly different claim. He contends that the State's explanation for striking juror Turner was pretextual because, according to Addison, the voir dire record in this case shows that non-minority venirepersons gave the same or similar answers as those given by Turner and they were not stricken.

It is certainly true that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." Miller-El, 545 U.S. at 241. But how should we treat a defendant's appellate claim in this regard where the defendant offered no substantive argument to the trial court as to why the State's proffered reason for striking a black panelist is pretextual?

Our appellate courts have not been presented with this precise question. There is of course ample authority for the proposition that "a defendant may not argue one ground for objection at trial and then raise new grounds on appeal." Gill v. State, 730 N.E.2d 709, 711 (Ind. 2000); see, e.g., Jester v. State, 551 N.E.2d 840, 843 (Ind. 1990); Phelan v. State, 406 N.E.2d 237, 239 (Ind. 1980). In such circumstances the issue is waived. Gill, 730 N.E.2d at 711. And to be sure both this Court and the Court of Appeals have ruled that Batson challenges were waived given the facts in a particular case. See, e.g., Weekly v. State, 496 N.E.2d 29, 31 (Ind. 1986) (declaring defendant waived his Batson claim where the only information in the record on appeal was that the defendant objected to the jury – no reason was given); Chambers v. State, 551 N.E.2d 1154, 1158 (Ind. Ct. App. 1990) (holding a race-based Batson claim waived where "[t]he record of voir dire is silent regarding the race of any prospective jurors challenged" and "[t]rial counsel did not make a contemporaneous objection to any of the prosecutor's [peremptory] challenges"). But in this case the defendant did make a specific Batson objection, and there is a trial record of the voir dire.

B. *Examination of Approaches to Waiver of <u>Batson</u> Claims*

Although reaching differing results, because several federal courts have been confronted with this issue, we rely on their authority for this discussion.[3] A number of circuit courts require that the party opposing a peremptory strike on the basis of similar non-struck jurors must make an explicit side-by-side juror comparison to the trial court to preserve a <u>Batson</u> claim on appeal. For example, the Eighth Circuit "will not consider claims of pretext based upon the failure to strike similarly situated jurors unless the point was raised in the district court." <u>United States v. Walley</u>, 567 F.3d 354, 358 (8th Cir. 2009). <u>See</u> <u>Swope v. Razzaq</u>, 428 F.3d 1152, 1155 (8th Cir. 2005) (noting that the opposing party "failed . . . to make the district court aware of any similarly situated jurors who had not been struck"); <u>United States v. Hunt</u>, 372 F.3d 1010, 1012 (8th Cir. 2004) ("Because Hunt did not identify any similarly situated jurors at trial, we do not consider the claim on appeal."). Similarly, the Eleventh Circuit has noted that the <u>Batson</u> burden-shifting framework mandates that "[o]nce the prosecution has offered a legitimate, non-discriminatory reason for exercising its strikes, [<u>Batson</u>'s burden of proof] requires the party contesting the strike to demonstrate that the prosecution's stated reasons are pretextual." <u>United States v. Houston</u>, 456 F.3d 1328, 1338 (11th Cir. 2006). The court rejected defendant's <u>Batson</u> claim on appeal where the defendant "did not suggest to the trial judge that there were similarly situated white venire members whom the prosecution did not strike." <u>Id.</u> The Fourth and Fifth Circuits have reached similar results. <u>See, e.g.</u>, <u>Davis v. Baltimore Gas & Elec. Co.</u>, 160 F.3d 1023, 1028, 1027 (4th Cir. 1998) (declaring that a plaintiff "waived his <u>Batson</u> challenge" where he "stood mute" after the prosecution presented a seemingly race-neutral justification); <u>United States v. Arce</u>, 997 F.2d 1123, 1127 (5th Cir. 1993) (holding that "[b]y failing to dispute the prosecutor's [race-neutral] explanation in the district court, defendants have waived their right to object to it on appeal").

---

[3] We note in passing that the few state courts addressing this issue have also reached differing results. <u>See, e.g.</u>, <u>People v. Jones</u>, 247 P.3d 82, 98 (Cal. 2011) (conducting comparative juror analysis where the issue is raised for the first time on appeal); <u>State v. Pona</u>, 926 A.2d 592, 609 (R.I. 2007) (refusing to conduct comparative juror analysis argued for the first time on appeal); <u>State v. Hugueley</u>, 185 S.W.3d 356, 369, 375 (Tenn. 2006) (finding waiver as to strikes to which defendant failed to raise any objection during voir dire, but performing "[a] close review of the transcript of the voir dire" and finding that "[n]o other person expressed such [views] and was left unchallenged" as to a strike to which defendant objected but failed to rebut).

Several circuits examine on appeal otherwise waived <u>Batson</u> claims under either a "plain error" or a "clear error" standard of review. The First Circuit describes the difference this way:

> A preserved <u>Batson</u> claim is one in which contemporaneous objection was raised at trial; an unpreserved <u>Batson</u> claim is one in which no such objection was raised at trial. We review preserved <u>Batson</u> claims for *clear error* . . . . We will not find clear error unless, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been committed. We . . . apply *plain error* review to unpreserved <u>Batson</u> claims. In applying this standard of review, we have observed a Supreme Court ruling that, unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.

<u>United States v. Charlton</u>, 600 F.3d 43, 50, 47 (1st Cir. 2010) (internal quotation marks and citations omitted) (emphasis added) (performing a side-by-side juror comparison where the only objection to a particular strike was "she's one of the two black jurors seated in the jury, and I think one of the few black jurors in the jury pool" and finding neither clear error nor plain error). The Sixth Circuit examined a defendant's <u>Batson</u> claim on appeal for plain error where the defendant "made no response" "when faced with the government's seemingly race-neutral explanation." <u>United States v. Jackson</u>, 347 F.3d 598, 605 (6th Cir. 2003) (noting "[i]f a defendant fails to rebut a race-neutral explanation at the time it was made, the district court's ruling on the objection is reviewed for plain error" and after performing a comparative juror analysis, concluding no error occurred). The Ninth Circuit has taken the same approach. <u>See</u> <u>United States v. Contreras-Contreras</u>, 83 F.3d 1103, 1105 (9th Cir. 1996) (declaring "[w]e review for plain error because [defendant's] counsel not only failed to make an initial objection to the challenge, but also failed to object to the prosecution's volunteered explanation," and noting that "'[p]lain error' is an actual error that is 'clear' and 'obvious' under current law" which "should be employed only in those cases 'in which a miscarriage of justice would otherwise result'" (quoting <u>United States v. Olano</u>, 507 U.S. 725, 734, 736 (1993)).

Similarly, addressing a trial court's denial of a defendant's <u>Batson</u> challenge, the District of Columbia Circuit reviewed for clear error those strikes to which the defendant objected at trial, and reviewed for plain error those strikes the defendant objected to only on appeal. <u>United</u>

11

States v. Moore, 651 F.3d 30, 42, 43 (D.C. Cir. 2011).  In both types of review, the court fully examined the voir dire record, made extensive juror comparisons, and quoted the jurors' voir dire statements from the trial transcript.  See id. at 42-44.  By contrast in United States v. Hendrix, the defense objected generally to the prosecutor's exercise of a peremptory challenge of the only two African Americans in the venire, however it offered no substantive rebuttal to the State's race-neutral explanation for the strikes.  509 F.3d 362, 367 (7th Cir. 2007).  The Seventh Circuit reviewed the defendant's Batson challenge on appeal for clear error rejecting the Government's argument that it should review the claim for plain error.  Id. at 367 n.3.  The Court ultimately concluded the prosecutor's peremptory challenges did not violate defendant's right to equal protection.  Id. at 372.

C.  *The Indiana Approach to an Otherwise Waived Batson Claim*

As noted above, Addison made a timely Batson objection to the State's use of its peremptory challenges to remove venireperson Turner.  He failed however to make any substantive rebuttal argument in response to the State's facially race-neutral reason for the removal.  Instead he advances this argument for the first time on appeal.  And he does so by inviting the Court to make a side-by-side comparison of similarly situated non-African American jurors who were permitted to serve.  See Br. of Appellant at 14-19.[4]

Rather than treating this failure as a waiver of Addison's Batson claim and thus forfeited for appellate consideration, we align ourselves with those jurisdictions that examine such claims on appeal, albeit under a more rigorous standard of review.  Our fundamental error doctrine is equal to the task.  See Smylie v. State, 823 N.E.2d 679, 689 n.16 (Ind. 2005) ("Like the federal 'plain error' doctrine, our 'fundamental error' rule sometimes affords relief to claimants who did

---

[4] The Court of Appeals rejected Addison's "side-by-side" comparison argument on grounds that "[h]e invites us to employ a more stringent legal test than has been prescribed by the United States Supreme court."  Addison, 49A05-1006-CR-354, slip op. at 7.  We disagree with our colleagues on this point.  Indeed, one way for a defendant to establish that the State's proffered reasons for a peremptory challenge are pretextual is to compare the African Americans who were struck to Caucasians who were empaneled.  See Miller-El, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step."); see also Snyder, 552 U.S. at 483-84 (conducting side-by-side juror comparison in evaluating a Batson claim even though no such comparison was made to the trial court).

not preserve an issue before the trial court and seek to raise it for the first time on appeal." ). A claim that otherwise has been waived by a defendant can be reviewed on appeal if the reviewing court determines that fundamental error occurred. See Brown v. State, 929 N.E.2d 204, 207 (Ind. 2010). The fundamental error exception is "extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." Mathews v. State, 849 N.E.2d 578, 587 (Ind. 2006). The error claimed must either "make[] a fair trial impossible" or constitute "clearly blatant violations of basic and elementary principles of due process." Clark v. State, 915 N.E.2d 126, 131 (Ind. 2009). Further, "[f]undamental error applies only when the actual or potential harm cannot be denied." Id. (internal quotation marks and citation omitted). With these principles in mind, we proceed to examine Addison's Batson claim.

D. *Analysis*

In proffering its race-neutral reason for excluding juror Turner, the State contended that in response to a question concerning the insanity defense Turner replied that he was "going to go by what the professionals say" and "when asked what else would contribute to making his decision, he had trouble articulating anything other than, well, I'll just go by whatever the professionals say." Tr. at 91. According to the State "[a]ll he did was to articulate is, 'Well, I'd just go with the doctors. I'd just go with the doctors.'" Tr. at 93. In point of fact this is not an accurate characterization of Turner's voir dire response. The record shows that Turner was first examined by the State. The following exchange occurred:

> [Lead Deputy Prosecutor]: I'm sorry, Mr. Turner, your questionnaire didn't come through, I can barely read the writing. I think it's the pen. How are you currently employed, sir?
>
> [Venireperson Turner]: I work with GPC Parts Company.
>
> [Lead Deputy Prosecutor]: Oh, a parts company, okay.
>
> [Venireperson Turner]: Yes.

13

[Lead Deputy Prosecutor]: Someone close to you has been charged with a crime and committed a crime; is that correct?

[Venireperson Turner]: No. I got the wrong check box or something?

[Lead Deputy Prosecutor]: I see something here for forgery is what's listed.

[Venireperson Turner]: No.

[Lead Deputy Prosecutor]: Okay. Maybe I have the wrong questionnaire here.

[Venireperson Turner]: I think you're asking the wrong question.

[Lead Deputy Prosecutor]: I apologize. No, the one I've got here, I don't think it's him.

[Second Deputy Prosecutor]: That's okay. Why don't you ask him individually.

[Lead Deputy Prosecutor]: All right. Anything that we've discussed here that might affect your ability to sit here today?

[Venireperson Turner]: No. I'm totally okay.

[Lead Deputy Prosecutor]: No. Ready to go, listen, and make judgments accordingly?

[Venireperson Turner]: Yes, sir.

[Lead Deputy Prosecutor]: All right. Well, thank you very much for your time. I'm going to pass the jury for cross at this time, Your Honor.

Tr. at 62-63. Turner was the final juror in the first group of venirepersons questioned by the State. The record shows that although questioning individually all fourteen venirepersons, the State only briefly touched upon the issue of the insanity defense, and then with only two venirepersons. See Tr. at 42-45.

14

The defense then began its questioning, and individually questioned each venireperson concerning his or her thoughts and opinions about the insanity defense. Turner was the ninth person to be so questioned. The following exchange occurred.

> [Defense Counsel]: Okay Mr. Turner, you've been awful quiet up there, haven't – well, let me pick on you a little bit, what do you think about it?
>
> [Venireperson Turner]: Oh, I don't know.
>
> [Defense Counsel]: You think it's selling you a bunch of hogwash?
>
> [Venireperson Turner]: Huh – no, it's not, no, it's not for me to say, you know, who's – who's sane and who's not. *I guess you just would have to go by what the professionals say and kind of interpret all the facts and take it all in.* It's a whole lot to take in.
>
> . . .
>
> [Defense Counsel]: Would you agree that it would be important to look at the facts surrounding the crime?
>
> [Venireperson Turner]: Yes.
>
> [Defense Counsel]: Okay. And a little bit about my client's history of mental illness. Do you think that would be important?
>
> [Venireperson Turner]: Uhm-hmm.

Tr. at 77-78 (emphasis added).

As can be seen by the foregoing exchange, it is true that Turner did say in part that he would "go by what the professionals say." But contrary to the State's assertion, this was not the only consideration that Turner indicated he would take into account. "I guess you just would have to go by what the professionals say *and kind of interpret all the facts and take it all in*" including the facts surrounding the crime and information about the defendant's history of mental illness. Tr. at 78. And the State is incorrect in its assertion that Turner responded, "Well, I'd just go with the doctors. I'd just go with the doctors." This mischaracterization of Turner's voir dire testimony is troubling and undermines the State's proffered race-neutral reason for the

15

strike.  See Miller-El, 545 U.S. at 244.  In addition, although the State initially had passed the venire for defense questioning, once Turner made statements the State contends were of concern, the State made no effort to examine him further.  And this is so in spite of the trial court advising the parties it would allow flexibility concerning the usual time limit allowed for voir dire because, "the issue of insanity might develop a lot of side issues."  Tr. at 9.  As the Supreme Court has observed, "'[t]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination.'"  Miller-El, 545 U.S. at 246 (quoting Ex parte Travis, 776 So. 2d 874, 881 (Ala. 2000)).

Just as important, the record supports Addison's contention that non-African American venirepersons on the same panel on which juror Turner served gave answers strikingly similar to those given by Turner and were not peremptorily challenged.  For example, before questioning Turner, the Defense had questioned venireperson Copelen.[5]

> [Defense Counsel]:  What do you think about the insanity defense?
>
> [Venireperson Copelen]:  Well, I think *you'd have to hear from the doctors and see what the background is, get all the facts from professionals.*
>
> [Defense Counsel]:  Okay.  Would you agree – I think there is going to be an instruction and the State will certainly point that out.  Ultimately, whether or not my client was insane is up to you guys to decide.  You don't have to accept the expert's word, you can look at other things.  *But would you agree, ma'am, that a trained psychiatrist has a little bit more experience in terms of whether or not somebody's mentally ill or not, than we are?*
>
> [Venireperson Copelen]: *Yes, that's right.*

Tr. at 70.

---

[5] The record shows that on individual questioning of venireperson Copelen the State did not mention the subject of insanity.  See Tr. at 51-52.

After questioning venireperson Turner, the Defense questioned venireperson Weber:

> [Defense Counsel]: [W]hat do you think about the insanity defense.
>
> [Venireperson Weber]: I think it's a valid defense and I wouldn't have trouble applying it.
>
> [Defense Counsel]: Okay. All right. What kind of things would you like to see to make your judge – other than the fact that somebody shot somebody and killed them?
>
> [Venireperson Weber]: I'd have to look at all of the facts. *Certainly the testimony of experts would, uhm, have credence with me.*

Tr. at 81 (emphasis added). Weber was one of the two venirepersons whom the State questioned concerning insanity. The exchange follows.

> [Deputy Prosecutor]: What's your thought [not only on the question of mental illness, but on the question of severity as well], ma'am?
>
> [Venireperson Weber]: No, I would think as – it's some of the evidence that we would have to consider would be that testimony given by the doctors (indiscernible).
>
> [Deputy Prosecutor]: And – and you understand –
>
> [Venireperson Weber]: I would consider it as part of the totality of the evidence.
>
> [Deputy Prosecutor]: So incorporate it as part of the evidence; is that correct?
>
> [Venireperson Weber]: Uhm-hmm.

Tr. at 44.

We see little distinction between the responses given by venirepersons Copelen and Weber and those given by venireperson Turner. Although phrasing their responses slightly

17

differently[6] all three noted the importance of expert witness testimony on the question of insanity, and all three agreed that additional evidence should be considered as well. But Turner was stricken and Copelen and Weber were not. In essence the same rationale offered by the State to remove Turner applied equally to jurors Copelen and Weber. We reiterate the Supreme Court's admonition, "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." Miller-El, 545 U.S. at 241. We recognize, as has the Supreme Court, that "a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial. In that situation, an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable." Snyder, 552 U.S. at 483.

Here, however, not only does an examination of the record show that the State failed to strike apparently similarly situated non-black venirepersons, but also the State mischaracterized Turner's voir dire testimony when offering its race-neutral reason for striking him from the panel and failed to engage Turner in any meaningful voir dire examination on the issue of his reliance on expert witness testimony. Considered individually or in isolation, these factors likely would not be sufficient under our fundamental error standard of review to undermine the State's claim that its reason for striking Turner was race-neutral. As we have noted, the fundamental error exception is "extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." Mathews, 849 N.E.2d at 587. But, the potential harm of a Batson violation is inescapable. "[T]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community." Georgia v. McCollum, 505 U.S. 42, 49 (1992) (quoting Batson, 476 U.S. at 87). "Active discrimination . . . during th[e] process [of jury selection] condones violations of the United States Constitution within the very institution entrusted with its enforcement, and so invites cynicism respecting the

---

[6] In Miller-El the Court noted, "A *per se* rule that a defendant cannot win a Batson claim unless there is an exactly identical white juror would leave Batson inoperable; potential jurors are not products of a set of cookie cutters." 545 U.S. at 247 n.6.

jury's neutrality and its obligation to adhere to the law." Powers v. Ohio, 499 U.S. 400, 412 (1991). Thus, "[r]acial discrimination has no place in the courtroom." Edmonson v. Leesville Concrete Co., 500 U.S. 614, 630 (1991). As one federal circuit has observed there is usually "little question that any Batson error we find would affect a defendant's substantial rights the violation of which would result in manifest injustice." United States v. Brown, 352 F.3d 654, 664 (2d Cir. 2003) (internal quotation marks and citation omitted). And "[f]or the same reason (since no court can countenance a violation of the Equal Protection Clause of the Constitution) any such error would 'seriously affect[ ] the fairness, integrity, or public reputation of judicial proceedings.'" Id. (quoting Olano, 507 U.S. at 732).

The State's mischaracterization of Turner's voir dire testimony, its failure to engage Turner in any meaningful voir dire examination to explore his alleged undue reliance on the testimony of professionals, and the comparative juror analysis, when taken collectively, leave us with the firm impression that the State's proffered explanation for striking venireperson Turner was a mere pretext based on race, making a fair trial impossible. "Peremptory challenges based on race . . . require a retrial." Highler, 854 N.E.2d at 826.[7]

**Conclusion**

We reverse the judgment of the trial court and remand this cause for a new trial.

Shepard, C.J., and Dickson, Sullivan and David, JJ., concur.

---

[7] Because we find a Batson violation as to venireperson Turner, we do not address Addison's argument with respect to venireperson Swanigan. See Snyder, 552 U.S. at 478.