

## IN THE
# Court of Appeals of Indiana

Elijah Reginald Davis,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Apr 07 2025, 9:15 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

April 7, 2025

Court of Appeals Case No.
24A-CR-1904

Appeal from the Lake Superior Court

The Honorable Natalie Bokota, Judge

Trial Court Cause No.
45G02-2208-MR-36

---

**Opinion by Judge Brown**
Chief Judge Altice and Judge Tavitas concur.

**Brown, Judge.**

[1] Elijah Reginald Davis appeals his conviction for murder, a felony. He contends that the trial court committed fundamental error during jury selection. We affirm.

## Facts and Procedural History

[2] In August 2022, nineteen-year-old Marcus Martinez spoke with sixteen-year-old Samir Griffin about wanting to purchase a gun for an acquaintance. Griffin made arrangements for a meeting at which seventeen-year-old Davis would sell Martinez a handgun for $700. Davis and Martinez did not know each other and had never met. In the late afternoon on August 22nd, Davis drove to Griffin's house, which was on the same street as Martinez's home in Merrillville. Griffin entered the front passenger seat of Davis's car and saw that Davis was holding a loaded gun in his left hand. Davis kept that gun in his hand as he drove, while the gun Davis planned to sell to Martinez was unloaded and under the driver's seat.

[3] When Davis and Griffin arrived at Martinez's house, Martinez came outside to Davis's car and approached the passenger window. Martinez told Griffin that he was trying to use CashApp to send payment from his mother to Davis. Martinez entered Davis's vehicle and sat in the back passenger seat. While still holding the loaded handgun in his left hand, Davis handed the unloaded sale gun to Martinez and observed as Martinez inspected the gun.

[4]    Martinez placed the gun on the back seat, exited the vehicle, and stated that he needed to go in his house "real quick." Transcript Volume IV at 106. Several minutes later, Martinez returned to Davis's vehicle, sat in the back passenger seat, and resumed his inspection of the sale gun. Both Griffin and Davis observed that Martinez appeared to have an object in the front pocket of his hoodie upon returning to the vehicle. As Martinez inspected the gun the second time, he said, "I'm gonna need this." *Id*. at 109. Griffin inquired, "[W]hat do you mean," and Davis asked Martinez, "[D]o you have the money?" *Id*. Martinez responded, "[N]o, but I'm gonna need this." *Id*. Griffin, who was "irritated" and trying to "look out for [his] safety," briefly "stepped out of the vehicle" but then reentered the vehicle and continued to ask Martinez, "What do you mean, you need this?" *Id*. at 109-110. Martinez just looked at Griffin "with a blank look like he [didn't] understand[.]" *Id*. at 112. After a brief "moment of silence," Davis pointed his loaded gun at Martinez and shot him. *Id*. Griffin immediately "jumped out of the car" and "ran," hearing at least one more shot fired as he "got closer towards" his house. *Id*. at 113.

[5]    Davis exited his vehicle, pulled Martinez out of the back seat by his armpits, and "threw" Martinez on the ground in front of the house. Transcript Volume III at 95. Martinez's mother exited the house after hearing two "gunshots," "one right after the other," as she was preparing dinner in her kitchen. Transcript Volume II at 236, 245. She saw a white car pulling away from the house and then saw her "son laying there." *Id*. at 241.

[6] A neighbor called 911, and first responders observed "a male on the grass, appeared to be unconscious, and there was a female" attending to him "that was pretty hysterical." *Id*. at 203. An ambulance took Martinez to the hospital, where he died a short time later. An autopsy revealed that Martinez's cause of death was homicide. Specifically, he suffered three gunshot wounds to the chest and the left flank area near his left kidney.[1] The shot to his chest was fatal because it injured his heart and lung.

[7] Police found a .40 caliber bullet casing at the scene and later recovered a spent bullet from inside the trunk of Davis's car and a spent bullet was recovered from Martinez's body during the autopsy. Both bullets matched a .40 caliber weapon. Davis was arrested on August 26, 2022.[2]

[8] On August 27, 2022, the State charged Davis with murder. On February 22, 2024, Davis filed a notice of intent to assert the defense of self-defense. A jury trial began on March 11, 2024. During voir dire, both the prosecutor and defense counsel questioned prospective jurors about self-defense and gun ownership, as well as their experiences with crime, the police, and the criminal

---

[1] Forensic Pathologist Dr. Zhuo Wang stated that, while Martinez suffered "three gunshot wounds," one of the wounds was a "reentry wound," so "likely he was shot by two bullets." Transcript Volume III at 158.

[2] Although a search of Davis's home resulted in the discovery of only two 9mm handguns, in September 2022, two .40 caliber handguns were given to Davis's attorney by Davis's family members. Examination revealed that one of those firearms, a Glock .40 caliber pistol, could have fired the bullets recovered from Davis's trunk and Martinez's body; however, those bullets were deformed so they could not be positively matched to any firearm.

justice system. During the third round of questioning, the following exchange occurred between the prosecutor and Potential Juror Number 93:

[Prosecutor]: Okay. It says on here, on your questionnaire, that you or someone close to you has been the victim of a crime?

[Potential Juror Number 93]: Yes.

[Prosecutor]: And can you, if you're comfortable, explain some of the details about that?

[Potential Juror Number 93]: I was a victim of stalking and battery. The person and I were – it was the person against me. And this was in Cook County Illinois in the early 90s. However, it turned into the State against the individual because he was actually a serial rapist.

[Prosecutor]: That's fairly alarming.

[Potential Juror Number 93]: Yes.

* * * * *

[Prosecutor]: Has anybody [addressing the whole jury panel] . . . been in a situation where they have had to use self-defense?

[Potential Juror Number 93]: Yes.

[Prosecutor]: Is that the situation we talked about previously?

[Potential Juror Number 93]: That's one of them.

[Prosecutor]: One of them? Okay.

[Potential Juror Number 93]: Just walking down the street where I used to live off of – on the south side of Chicago.

[Prosecutor]: Okay.

[Potential Juror Number 93]: And getting grabbed and someone pulling me. And then I got – I said a prayer, got real angry, and started pulling him to the street. And someone got the person's attention and we both snapped out of it, because I was going to throw him in traffic. That's all.

\* \* \* \* \*

[Prosecutor]: Okay. This was somebody you, had . . . No dealing, you had never met him?

[Potential Juror Number 93]: No.

[Prosecutor]: You never did anything to make him feel like he was in danger; correct?

[Potential Juror Number 93]: When I started pulling him in the street, yes.

[Prosecutor]: Ok. But that's kind of after.

[Potential Juror Number 93]: Well, I got really afraid, and I couldn't run, so I had to fight. And I pulled him to the parked cars going up and down 115th. And I was going to throw him in the traffic. And I told him he was going to die that day, but he didn't.

[Prosecutor]: Showed him some mercy, huh?

[Potential Juror Number 93]: Well, I snapped out of it . . . It wasn't fun.

[Prosecutor]: Yeah, that doesn't sound like fun. Thank you for sharing.

Transcript Volume II at 141-152.

[9] When questioned by defense counsel about whether she "had any problem" with the concept of someone who believes they are at risk of death or serious bodily injury "using deadly force themselves," Potential Juror Number 93 responded, "Only if they're, like, really mistaken, which people can be mistaken all day." *Id*. at 155. After defense counsel informed Potential Juror Number 93 that the self-defense standard is "if a person reasonably believes," she agreed that "reasonableness" would be based on "what [she] see[s] and hear[s] and all the information available[.]" *Id*. at 156.

[10] After questioning the third panel of jurors, the State exercised a peremptory strike of Potential Juror Number 93. Referencing the State's strike of Potential Juror Number 93, defense counsel argued, "Your Honor, with regard to the strike. I'm requesting a race neutral explanation for the record." *Id*. at 157. Defense counsel stated, "This is – [J]uror [N]umber 93 is an African American woman. As a matter of fact, she is the first African American to be called to the jury box out of the panel[.]" *Id*. The prosecutor responded, "Yes, your Honor. I would just simply state that the State is requesting to strike her based on her attitudes and feelings towards self-defense." *Id*. The trial court then pressed the prosecutor further asking, "Could you be more specific?" *Id*. The prosecutor responded, "Yes. Just based on how she's described what she believes reasonable self-defense to be and her experiences on multiple occasions where she's had to use self-defense." *Id*. The court stated, "Well, first of all, under *Batson* and its progeny, there needs to be a pattern as to strikes. Although case

law is devout that a race neutral explanation can be required. The explanations that she's given answers concerning self-defense, that raises a concern for the State." *Id*. at 157-158. Defense counsel then pointed out, "[P]ost *Batson*, the pattern requirement has been eliminated." *Id*. at 158. The court responded, "Uh-huh. All right. So we'll allow the strike over objection. And we'll show that it is a peremptory strike counted against the State." *Id*. The court then excused Potential Juror Number 93. After two more rounds of jury selection, the court seated the final few jurors as well as the alternates.

[11] During trial, it was undisputed that Davis shot Martinez during the prospective gun sale transaction and that Martinez died from his injuries; however, Davis maintained that he used deadly force in self-defense. At the conclusion of trial, the jury found Davis guilty of murder. The court sentenced Davis to forty-five years in the Department of Correction.

## Discussion

[12] Davis argues that the "trial court erred when it did not conduct the third-step analysis required under *Batson* [*v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986)]. It failed to do any evaluation of the plausibility of the State's proffered race-neutral explanation for the preemptory strike of the venire's only Black juror[.]" Appellant's Brief at 10. He further maintains that the State's "proffered race-neutral justification for its strike was pretextual, which constitutes fundamental error and requires this Court to grant [him] a new trial." *Id*. The State responds that the trial court properly evaluated the

credibility of its race-neutral explanation for striking Potential Juror Number 93, and that its explanation was not a pretext for racial discrimination.

[13]     The Indiana Supreme Court has explained the "*Batson Framework*" as follows:

> "Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Batson v. Kentucky*, 476 U.S. 79, 86, 106 S. Ct. 1712, 90 L.Ed.2d 69 (1986). The exclusion of even a sole prospective juror based on race, ethnicity, or gender violates the Fourteenth Amendment's Equal Protection Clause. *See Snyder v. Louisiana*, 552 U.S. 472, 478, 128 S. Ct. 1203, 170 L.Ed.2d 175 (2008).
>
> A defendant's race-based *Batson* claim involves a three-step process. At the first stage the burden is low, requiring that the defendant only show circumstances raising an inference that discrimination occurred. *See Johnson v. California*, 545 U.S. 162, 170, 125 S. Ct. 2410, 162 L.Ed.2d 129 (2005). This is commonly referred to as a "prima facie" showing.
>
> \* \* \* \* \*
>
> At the second stage, if the first stage showing has been satisfied, then the burden shifts to the prosecution to "offer a race-neutral basis for striking the juror in question." *Snyder*, 552 U.S. at 477, 128 S. Ct. 1203 (quoting *Miller-El v. Dretke*, 545 U.S. 231, 277, 125 S. Ct. 2317, 162 L.Ed.2d 196 (2005) (Thomas, J., dissenting)). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett v. Elem*, 514 U.S. 765, 768, 115 S. Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam) (quoting *Hernandez* [v. *New York*], 500 U.S. [352], 360, 111 S. Ct. 1859 [(1991)]). Although the race-neutral reason must be more than a mere denial of improper motive, the reason need not be particularly "persuasive, or even plausible." *Id*.

* * * * *

At the third and last stage of a *Batson* inquiry, "in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." *Snyder*, 552 U.S. at 477, 128 S. Ct. 1203 (quoting *Miller-El*, 545 U.S. at 277, 125 S. Ct. 2317 (Thomas, J., dissenting)). Accord *Jeter v. State*, 888 N.E.2d 1257, 1263 (Ind. 2008)[,*cert. denied*]. Although the burden of persuasion on a *Batson* challenge rests with the party opposing the strike, *Jeter*, 888 N.E.2d at 1264, the third step—determination of discrimination—is the "duty" of the trial judge. *See Miller-El*, 545 U.S. at 239, 125 S. Ct. 2317 (quoting *Batson*, 476 U.S. at 98, 106 S. Ct. 1712); *Jeter*, 888 N.E.2d at 1264. The trial court evaluates the persuasiveness of the step two justification at the third step. It is then that "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768, 115 S. Ct. 1769. The issue is whether the trial court finds the prosecutor's race-neutral explanation credible. "[T]he rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." *Miller-El*, 545 U.S. at 251-[2]52, 125 S. Ct. 2317 (citations omitted). Also, at the third stage, the defendant may offer additional evidence to demonstrate that the proffered justification was pretextual.

*Addison v. State*, 962 N.E.2d 1202, 1208-1211 (Ind. 2012).

[14]    The parties here agree that steps one and two of the *Batson Framework* were satisfied. Davis first argues that the trial court erred at the third step by failing to explicitly credit the State's facially race-neutral explanation for striking Potential Juror Number 93. He asserts that the trial court "clearly conflated stages two and three by failing to evaluate the credibility or plausibility of the

State's proffered justification for its strike." Appellant's Brief at 14. We disagree.

[15] The record reveals that after the prosecutor gave an initial race-neutral explanation for striking Potential Juror Number 93 (step two), the trial court pressed further for a more specific articulation of the justification for the strike, which the State was able to articulate. Indeed, the court appeared to acknowledge that the State's more specific race-neutral articulation was supported by Potential Juror Number 93's answers "concerning self-defense" given during voir dire that "raises concern for the State." Transcript Volume II at 157. When asked if he wished to "make further record," defense counsel, for his part, offered no additional evidence to demonstrate that the proffered justification was pretextual. *Id.* at 158. Davis's claim that "the trial court simply acquiesced to the State's facially neutral explanation for its strike" is unsupported by the record. Appellant's Reply Brief at 7. To the extent Davis suggests the trial court was required to make a factual finding supporting its third-step determination, it is well settled that the trial court was not required to do so. *See Cartwright v. State,* 962 N.E.2d 1217, 1222 (Ind. 2012) (providing that neither state nor federal law require a trial court to make explicit findings when deciding whether the State offered a race-neutral reason for striking a potential juror). Based upon the record presented, we conclude the trial court fulfilled its

duty to evaluate the persuasiveness of "the step two justification" as required at "the third and last stage of a *Batson* inquiry." *Addison*, 962 N.E.2d at 1208.[3]

[16] Even assuming the trial court adequately fulfilled its third-step duty under *Batson*, Davis maintains that the record reveals that the State's peremptory strike to Potential Juror Number 93 was pretextual and that the trial court clearly erred in concluding otherwise. We note generally that "upon appellate review, a trial court's decision concerning whether a peremptory challenge is discriminatory is given great deference, and will be set aside only if found to be clearly erroneous." *Cartwright*, 962 N.E.2d at 1221 (quoting *Forrest v. State*, 757 N.E.2d 1003, 1004 (Ind. 2001)); *see also Jeter*, 888 N.E.2d at 1265 ("On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.") (citing *Snyder*, 552 U.S. at 478). "The trial court's conclusion that the prosecutor's reasons were not pretextual is essentially a finding of fact that turns substantially on credibility. It is therefore accorded great deference." *Highler v. State*, 854 N.E.2d 823, 828 (Ind. 2006).

[17] Davis concedes that he did not make any substantive rebuttal argument or objections to the State's race-neutral explanation given to the trial court. For the first time on appeal he argues that the "record of voir dire . . . shows that non-Black members of the venire espoused similar views, and had similar

---

[3] We acknowledge the trial court's misstatement, regarding step one of the *Batson* inquiry, indicating that "there needs to be a pattern as to strikes." Transcript Volume II at 157. However, Davis pointed out the misstatement to the court and the court appeared to acknowledge the misstatement before proceeding to properly make an ultimate credibility determination as required by step three of the *Batson* analysis.

experiences to [Potential] Juror Number 93, but were not peremptorily challenged by the State," and he urges this Court to address his claim pursuant to fundamental error principles as instructed by the Indiana Supreme Court in *Addison*. Appellant's Brief at 17. Specifically, the *Addison* Court determined that Indiana's approach to an "otherwise waived *Batson* claim" would be for appellate courts to examine such claims pursuant to the fundamental error doctrine. *Addison*, 962 N.E.2d at 1213. The Court explained:

> The fundamental error exception is "extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Mathews v. State*, 849 N.E.2d 578, 587 (Ind. 2006). The error claimed must either "make[ ] a fair trial impossible" or constitute "clearly blatant violations of basic and elementary principles of due process." *Clark v. State*, 915 N.E.2d 126, 131 (Ind. 2009). Further, "[f]undamental error applies only when the actual or potential harm cannot be denied." *Id.* (internal quotation marks and citation omitted).

*Id.* In evaluating the defendant's pretext claim regarding a granted peremptory strike by the State, the *Addison* Court engaged in a "side-by-side comparison of similarly situated non-African American jurors who were permitted to serve." *Id.*

[18] Our examination of the record does not reveal that the State failed to strike apparently similarly situated non-African American venirepersons. Davis points to Potential Juror Number 3, who was questioned prior to Potential Juror Number 93, and Potential Juror Number 95, who was questioned

contemporaneously with Potential Juror Number 93, and claims that they were similarly situated to Potential Juror Number 93 but were not challenged by the State.[4]  Potential Juror Number 3 indicated that his house had been broken into and that he "actually wrestled with the guy," and Potential Juror Number 95 indicated that his "grandmother was mugged several years ago" and that she "fought real hard for her purse" before losing it to her assailant.  Transcript Volume II at 29, 147.  Davis complains that despite these jurors' espoused personal experiences, the "State declined to explore" these jurors' further views on self-defense as the State did with Potential Juror Number 93.  Appellant's Brief at 19.

[19]    However, unlike those jurors, the record reveals that Potential Juror Number 93 volunteered that she had used self-defense on multiple occasions and then, on her own accord and without prompting by the prosecutor, she indicated that she had attempted to use deadly force in self-defense on at least one of those occasions.  Transcript Volume II at 150-151.  It was only after this disclosure that the prosecutor asked for further explanation of her views on self-defense

---

[4] To the extent that Davis invites this Court to also compare the State's treatment of Potential Juror Numbers 105 and 111, both of whom were questioned in the final two rounds of questioning after Potential Juror Number 93 was stricken, we decline.  Davis's counsel described Potential Juror Number 93 as "the first African American to be called to the jury box out of the panel" which was during the third round of questioning.  Transcript Volume II at 157.  Although Davis's argument presumes that these subsequently questioned and unchallenged jurors were "similarly situated non-Black venirepersons," Appellant's Brief at 20, the record is silent as to the racial makeup of jurors in the final two rounds.  As noted by the State, Davis has not included juror questionnaires in the record to substantiate his presumptions.  It is well established that "it is the appellant's burden to provide us with an adequate record to permit meaningful appellate review," and failure to do so results in waiver of the argument.  *Martinez v. State*, 82 N.E.3d 261, 263 (Ind. Ct. App. 2017), *trans. denied*.

and the proportionality of her response. Potential Juror Number 93 made clear that she intended for her assailant "to die, but he didn't," and that she had no intention of showing her assailant "mercy." *Id.* at 151-152. After side-by-side comparison, unlike in *Addison*, we cannot say that Potential Juror Number 93's voir dire responses were "strikingly similar" to responses given by the unchallenged jurors such that "the same rationale offered by the State to remove [Potential Juror Number 93] applied equally to [Potential Jurors 3 and 95]." *Cf. Addison*, 962 N.E.2d at 1215 (finding "little distinction between responses" given by unchallenged venirepersons and peremptory challenged venireperson and recognizing that "a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial. In that situation, an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable") (citation omitted).

[20] Moreover, contrary to Davis's suggestion, the State here did not mischaracterize Potential Juror Number 93's voir dire testimony when offering its race-neutral reason for striking her from the panel. *Cf. id*. at 1216 (noting that "not only does examination of the record show that the State failed to strike apparently similarly situated non-black venirepersons, but also the State mischaracterized Turner's voir dire testimony when offering its race-neutral reasons for striking him from the panel and failed to engage Turner in any meaningful voir dire examination" and that "[c]onsidered individually or in

isolation, these factors likely would not be sufficient under our fundamental error standard of review to undermine the State's claim that its reasons for striking Turner was race-neutral" but "taken collectively . . . leave us with the firm impression that the State's proffered explanation for striking venireperson Turner was a mere pretext based on race, making a fair trial impossible"). Under the circumstances presented, we are not left with the firm impression that the State's proffered explanation for striking Potential Juror Number 93 was a mere pretext based on race. We conclude that Davis has not met his burden to establish fundamental error.

For the foregoing reasons, we affirm Davis's conviction.

Affirmed.

Altice, C.J., and Tavitas, J., concur.

ATTORNEYS FOR APPELLANT

J. Michael Woods
Maryrachel Durso
Stracci Law Group, P.C.
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana