**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**JOEL SCHUMM**
Appellate Clinic
Indiana University Robert H. McKinney
School of Law
Indianapolis, Indiana

**JONATHAN HARWELL**
Certified Legal Intern
Appellate Clinic
Indiana University Robert H. McKinney
School of Law
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**BRIAN REITZ**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| ANTWUAN BROWN, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| vs. | )   No.  49A02-1108-CR-726 |
| | ) |
| STATE OF INDIANA, | ) |
| | ) |
| Appellee. | ) |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Becky Pierson-Treacy, Judge
The Honorable Shatrese M. Flowers, Master Commissioner
Cause No.  49F19-1102-CM-10236

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**DARDEN, Judge**

STATEMENT OF THE CASE

Antwuan Brown appeals his convictions for class A misdemeanor resisting law enforcement[1] and class B misdemeanor disorderly conduct.[2]

We affirm.

ISSUES

1.  Whether the trial court erred in denying Brown's objection to the State's use of peremptory challenges to strike an African–American from the jury venire.

2.  Whether the trial court abused its discretion in excluding evidence.

FACTS

Lanatasha Jones first met Brown the morning of February 14, 2011, when she woke up after staying at the apartment of a friend, Virgie Coleman. Brown also had stayed at the apartment but left in the morning to "go to the blood bank." (Tr. 30). Brown later returned to the apartment and began drinking, imbibing approximately two

---

[1] Ind. Code § 35-44-3-3.

[2] I.C. § 35-45-1-3.

pints of gin or vodka. Brown then began talking to Jones about Jones's boyfriend and something the boyfriend had said about Coleman.

Brown again left the apartment only to return still upset "about what [Jones's] boyfriend had said." (Tr. 32). After telling Jones to tell her boyfriend to "stay out of [his] business," Brown once again left the apartment. (Tr. 32). Brown, however, returned with a friend, John Covington, and "started drinking" some gin he had purchased earlier. (Tr. 33).

Brown, still angry, told Jones to tell her boyfriend to "meet [him] out on the street." (Tr. 34). When Jones refused to call her boyfriend, Brown threw the phone at her and again left the apartment. Brown returned shortly thereafter with more alcohol, which he drank. Brown became belligerent toward Jones and pushed her head with his open hand, which gave Jones a headache.

After pushing Jones's head several times, Brown left the room. When he came back, however, he got "in [Jones's] face." (Tr. 40). At that point, Covington "pushed him away from [Jones] and told him, 'Man, she's a girl.'" (Tr. 40). Covington began to struggle with Brown, trying to keep him away from Jones. As Covington restrained Brown, Jones fled the apartment and called the police.

Indianapolis Metropolitan Police Officers Adam Mengerink, Christopher Carlson, and Steven Gray responded to the call "within minutes," at approximately 10:00 p.m. (Tr. 60). When the officers arrived at the scene, they observed a distraught Jones waiting outside the apartment building. The officers had Jones wait downstairs while they went

3

up to Coleman's apartment. When Brown came to the door, Officer Mengerink observed that he was wearing only a pair of pants and a pair of shoes. Brown's "demeanor initially was very aggressive. He had his chest puffed out, he had his fi[s]ts clamped up." (Tr. 66). Brown's eyes appeared "glassy" and bloodshot, and the odor of alcohol emanated from him. (Tr. 66). The officers believed Brown to be intoxicated.

Brown refused to respond to the officers' questions and made threatening gestures. For the officers' safety, they placed Brown in handcuffs and led him downstairs.

When they returned downstairs, they led a handcuffed Brown outside, where Brown kept yelling loudly, "'We [sic] at war, we [sic] at war.'" (Tr. 43). Despite being told to calm down, Brown kept yelling and cursing at the officers. Officer Mengerink attempted to pat Brown down, again for officer safety, but because Brown was "moving around real figidety [sic] and wasn't being real cooperative" and because it was a cold night, Officer Mengerink decided to place Brown in one of the marked patrol vehicles. (Tr. 69).

As Officer Mengerink started to place Brown in the vehicle, Brown "put one leg in and then he started pushing back towards [Officer Mengerink] as if to get away or not get in the vehicle." (Tr. 69). Brown pushed Officer Mengerink into the vehicle's door. The officers then tried to sit Brown down on the curb, but Brown "was still very non compliant. He was "yelling obscenities" and "moving around." (Tr. 71). Brown started "swinging" his head "back and forth" and "stood up against Officer Mengerink," as he attempted to keep Brown in a seated position. (Tr. 109). The officers told Brown several

4

times to sit down, calm down, and be still. They also warned Brown to stop yelling, indicating that they would arrest him for being disorderly because Brown's behavior was drawing a crowd.

Afraid that Brown, in his intoxicated and agitated state, might hit his head on the curb, the officers moved him to a grassy area. As the officers placed Brown on the ground, he began "to kick to get away" and "twist[] his body one direction to the other." (Tr. 110). Brown also began cursing.

The officers requested that a police wagon be sent "because of the commotion and the crowd that [Brown] was drawing." (Tr. 75). When the wagon arrived, the officers asked Brown to get into the wagon, but he did not comply. The officers then "picked him up to put him in the wagon at which time [he] had apparently passed out." (Tr. 75). One of the officers therefore requested that paramedics be dispatched.

Brown appeared to be unconscious when paramedics arrived. The paramedics performed a finger prick on Brown and determined that he should be transported to Wishard Hospital. Once in the ambulance, Brown regained consciousness whereupon, he "spit on one of the medics" and began "kicking his legs all over . . . ." (Tr. 113). Officers then used shackles to restrain Brown before the paramedics transported him to the hospital.

On February 15, 2011, the State charged Brown with Count 1, class A misdemeanor battery; Count 2, class A misdemeanor resisting law enforcement; and Count 3, class B misdemeanor disorderly conduct. On April 20, 2011, the State filed a

5

motion in limine, seeking to exclude any reference to, or testimony regarding, Brown's blood sugar level on the night of February 14, 2011. The trial court granted the motion.

The trial court held a jury trial on July 21, 2011. During voir dire, the State asked the prospective jurors "[w]hat kind of touching" they would "require in order for somebody to be found guilty of battery[.]" (Tr. 287). The following colloquy then took place:

> Prospective Juror [J-D.]:    Whether it causes bodily harm as far as touching, not necessarily to restrain a person . . . .
>
> [State]:        So you would want to see bruising, scratching, cutting some kind of physical injury?
>
> Prospective Juror [J-D.]:    Yes.
>
> . . . .
>
> [State]:        . . . What if they just said it hurt, would that be enough for you?
>
> Prospective Juror [J-D.]:    No.
>
> [State]:        That would not be enough. Okay. Miss [Br.], I see you shaking your head, do you agree with Miss [J-D.] that you would require more than just—
>
> Prospective Juror [Br.]:    Yeah.
>
> [State]:        --just pain?
>
> Prospective Juror [Br.]:    Yeah, I want to—yeah to do it aggressively.

(Tr. 287-88).

Next, Brown's counsel engaged in voir dire with the prospective jurors as follows:

6

[Counsel]: . . . I'm asking you guys if someone is accused of a battery what kind of investigation would you like to see the police do? What kind of investigation should the police be doing if there's a battery. What do you think Miss [Br.]?

Prospective Juror [Br.]: Talk to witnesses. And look for physical evidence.

[Counsel]: What kind of evidence would you as a juror like to see?

. . . .

Prospective Juror [Br.]: Any—any bruising or any mark left or by talking to the person the battery was supposedly put upon, you know. Listening to their side of the story and hearing how they feel.

. . . .

[Counsel]: Sure, okay. Miss [Z.], you heard what Miss [Br.] said about what she would like to see. Okay, what did you hear her say?

Prospective Juror [Z.]: She said bruising, talking to witnesses . . . .

[Counsel]: Okay, okay.

Unidentified Prospective Juror: If they could possibly see if there were any hospital reports, doctors reports, statements that may be part of . . . .

[Counsel]: Okay.

Unidentified Prospective Juror: Pictures, because bruising goes away. Pictures of the area. I would want to know the circumstances. And the history of the two people involved in order to . . . .

[Counsel]: Okay, and these are the things that you would want to know before you decide if you can judge a person guilty of that battery or not, is that what I'm hearing?

7

(Tr. 308-10). The unidentified prospective juror did not give an audible answer, if any.

The State used its peremptory challenges to strike five prospective jurors, including Prospective Juror J-D., an African-American woman, and Prospective Juror Br., from the venire. The State did not strike Prospective Juror S. As to Prospective Juror J-D., Brown raised a *Batson* challenge, alleging that the State had used its peremptory challenge for a racially discriminatory purpose.

The State argued that it had a racially-neutral basis for striking Prospective Juror J-D.; specifically, that the State "struck her due to her answer on the battery element . . . . She said that she wanted to see some type of injury and that pain would not be enough to find a conviction of bodily injury." (Tr. 318). The trial court overruled Brown's *Batson* challenge, finding that J-D. "did say that pain was not enough." (Tr. 319).

Brown's counsel then seemed to argue that the State's reason for striking J-D. applied just as well to another panelist, who was permitted to serve, stating, "that was the same answer given by Miss S. and Miss—who was the other person, I don't remember. But I think that it's on the record so . . . ." (Tr. 319). Neither party made any further argument, and the trial court made no further ruling.

During the trial, Brown made an offer to prove regarding statements made by the paramedics at the scene to Officer Carlson. During the offer to prove, Officer Carlson testified that paramedics informed him that they had tested Brown's blood sugar and that his blood sugar level was "extremely low." (Tr. 138). He further testified that

8

paramedics wanted to transport Brown to Wishard Hospital, which has a "wing or an area for prisoners . . . in custody receiving medical treatment . . . under the direction of . . . IMPD[.]" (Tr. 138).

Brown then argued that the paramedics were acting as the State's agents, and therefore, their statements to Officer Carlson should be admitted as that by a party-opponent. The trial court affirmed its original ruling and excluded the testimony.

The jury found Brown guilty of Count 2, class A misdemeanor resisting law enforcement and Count 3, class B misdemeanor disorderly conduct. Following a sentencing hearing, the trial court sentenced Brown to concurrent sentences of 365 days, with 335 days suspended, on Count 2; and 180 days, with 150 days suspended, on Count 3.

Additional facts will be provided as necessary.

## DECISION

1. Batson Challenge

Brown asserts that the trial court erred in overruling his *Batson* objection.

"Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure. The exclusion of even a sole prospective juror based on race, ethnicity, or gender violates the Fourteenth Amendment's Equal Protection Clause."

Pursuant to *Batson* and its progeny, a trial court must engage in a three-step process in evaluating a claim that a peremptory challenge was based on race. "First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis

9

for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." A step two explanation is considered race-neutral if, on its face, it is based on something other than race. Although the burden of persuasion on a *Batson* challenge rests with the party opposing the strike, the third step—determination of discrimination—is the "duty" of the trial judge. The trial court evaluates the persuasiveness of the step two justification at the third step. It is then that "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." Also, at the third stage, the defendant may offer additional evidence to demonstrate that the proffered justification was pretextual.

"Upon appellate review, a trial court's decision concerning whether a peremptory challenge is discriminatory is given great deference, and will be set aside only if found to be clearly erroneous."

*Cartwright v. State*, 962 N.E.2d 1217, 1220-21 (Ind. 2012) (internal citations omitted).

Here, the record is not clear whether J-D. was the only African-American prospective juror. Thus, we cannot say that Brown made a prima facie showing of discrimination based on race with regard to J-D.[3] *See Addison v. State*, 962 N.E.2d 1202, 1208-09 (Ind. 2012) (stating that the removal of the only African-American juror raises an inference of racial discrimination). Nevertheless, this preliminary issue is moot as the State advanced as the reason for striking J-D. the fact that she would require the State to prove more than pain in order to convict Brown of battery, and the trial court, proceeding under the third step, determined that the State's challenge was not discriminatory. *See id.* at 1209 n.2 (noting that where the State offers a race-neutral explanation for its challenge,

---

[3] The record is not clear whether J-D. was the only prospective African-American on the panel. Without citation to the record, Brown asserts that prospective jurors Br. and S. were Caucasian.

and the trial court rules on whether it is intentional discrimination, the preliminary issue of whether the defendant made a prima facie showing of discrimination is moot).

On rebuttal, Brown's counsel noted that S. and another prospective juror, the name of whom counsel could not remember, had given the same answer. Again, the State did not strike S. from the panel. It is upon this basis that Brown asserts the trial court erred, and he therefore is entitled to a new trial.[4]

"'[I]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step.'" *Collier v. State*, 959 N.E.2d 326, 328-29 (Ind. Ct. App. 2011) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005)).

> We recognize, as has the Supreme Court, that "a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial. In that situation, an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable."

*Addison*, 962 N.E.2d at 1216 (quoting *Snyder v. Louisiana*, 552 U.S. 472, 483 (2008)).

---

[4] We note that Brown states that the unidentified prospective juror to which his trial counsel referred was S. Although it is true that "neither the court nor the State disputed this at trial," (Brown's br. at 5), Brown nevertheless makes an assumption as to the identity of the unidentified prospective juror. Brown's assumption is especially troubling because in response to the State's argument that S. was the unidentified prospective juror who responded that pain alone "<u>would</u> constitute battery," (tr. 289) (emphasis added), Brown points out that "[t]here is no indication that it was juror S. who made the quoted statement." Brown's Reply Br. 3. Nevertheless, whether S. indeed was the unidentified prospective juror does not impact our decision. Thus, for the sake of argument, we proceed as if the unidentified prospective juror to whom Brown refers indeed was S. but that S. was not the unidentified prospective juror to whom the State refers.

Here, the record shows that both J-D. and Br. stated that they would require that an alleged victim suffer more than pain in order to convict a defendant of battery. Specifically, J-D. affirmed that she would "want to see bruising, scratching, cutting, some kind of physical injury[.]" (Tr. 287). Br. agreed that she would require more than "just pain[.]" (Tr. 287). Br. later reiterated that she would require the State to present evidence such as "any bruising or any mark left . . . ." (Tr. 309). It is clear from the record that both J-D. and Br., both of whom the State struck as jurors,[5] would have required evidence of more than physical pain to convict Brown of battery.

In response to Brown's counsel's question to another prospective juror regarding what she heard Br. say, an unidentified prospective juror—presumably S.—stated, "If they could possibly see if there were any hospital reports, doctors reports, statements that may be part of . . ." and "[p]ictures, because bruising goes away. Pictures of the area. I would want to know the circumstances. And the history of the two people involved . . . ." (Tr. 309-10). The unidentified prospective juror gave no apparent answer when asked whether those were "the things that [she] would want to know before [she] decide[d] if [she] c[ould] judge a person guilty of that battery or not[.]" (Tr. 310).

We cannot say that the State's proffered reason for striking J-D. applies just as well to S. A review of the answers given by S. reveals that her answers were not truly comparable to those of J-D. or even Br. She did not definitively state that she would require evidence of more than physical pain before finding Brown guilty of battery.

---

[5] The record does not indicate the reason for striking Br. from the jury.

12

Accordingly, we cannot say that the State's proffered reason for striking J-D. applied as well to S.

Based upon the foregoing, we find that the State's proffered reason for peremptorily challenging J-D. were facially valid, and we find no inherent racially discriminatory intent. We therefore cannot say that the trial court erred in rejecting Brown's *Batson* challenge.

2. Admission of Evidence

Brown also asserts that the trial court abused its discretion in excluding the statements made by paramedics to Officer Carlson that Brown's blood sugar level was low the night of February 14, 2011. Brown offered the statement "to rebut the State's repeated references to [his] supposed intoxication." Brown's Br. at 8. Brown contends that the paramedics were acting as an agent of the State, and therefore, the statement was admissible as that made by a party-opponent pursuant to Indiana Evidence Rule 801(d)(2).

> We note that the admission or exclusion of evidence is within the sound discretion of the trial court, and we will reverse the trial court's determination only for an abuse of that discretion. An abuse of discretion occurs when a decision is clearly against the logic and effect of the facts and circumstances before the trial court. In reviewing the admissibility of evidence, we consider only the evidence in favor of the trial court's ruling and any unrefuted evidence in the appellant's favor. As a rule, errors in the admission or exclusion of evidence are to be disregarded as harmless unless they affect the substantial rights of a party. In determining whether an evidentiary ruling affected a party's substantial rights, we assess the probable impact of the evidence on the trier of fact.

13

*Redding v. State*, 844 N.E.2d 1067, 1069 (Ind. Ct. App. 2006) (internal citations omitted), *reh'g denied*.

In his brief, Brown cites to several internet sources for the proposition that low blood sugar levels may result in symptoms that mimic intoxication.[6]  Brown, however, did not present this as evidence at trial.  We therefore will not consider it.  *See R.R.F. v. L.L.F.*, 956 N.E.2d 1135, 1142 n.4 (Ind. Ct. App. 2011) (noting that this court cannot consider matters outside the record).

The jury, however, did hear extensive testimony regarding Brown's alcohol consumption and behavior the night of February 14, 2011.  Jones, Coleman and Covington all testified that Brown had been drinking throughout the day prior to his altercation with Jones.  Officers Mengerink and Gray testified that an odor of alcohol emanated from Brown.  All three responding officers testified that Brown appeared intoxicated.

The officers further testified that Brown exhibited aggressive behavior toward the officers, including pushing Officer Mengerink.  They also testified that Brown drew a large crowd outside by yelling and cursing and continued yelling despite being told to stop by the officers.

Given the above evidence, we cannot say that Brown was prejudiced or his substantial rights affected by the trial court's exclusion of the paramedics' statements.

---

[6] We note that Brown was not charged with public intoxication and that intoxication is not an element of either resisting law enforcement or disorderly conduct.  It is not clear from either the trial or Brown's brief whether Brown sought to introduce evidence regarding his blood sugar levels to raise the issue of whether his conduct was voluntary.

14

Although Brown presented evidence that the paramedics told Officer Carlson that Brown's blood sugar level was low, Brown failed to establish by an offer of proof that there was a nexus between Brown's blood sugar level and his behavior on the night of the offense. In addition, Brown had ample opportunity to examine the witnesses, and the jury had ample opportunity to judge the witnesses' credibility. Thus, any alleged error in excluding testimony was harmless.

Affirmed.

RILEY, J., and NAJAM, J., concur.