## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 29 2016, 6:03 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Elizabeth A. Bellin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Paul Patterson,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

March 29, 2016

Court of Appeals Case No.
20A03-1504-CR-123

Appeal from the Elkhart Superior Court

The Honorable Charles C. Wicks, Judge

Trial Court Cause No.
20D05-1405-FD-487

**Pyle, Judge.**

# Statement of the Case

[1] Paul Patterson ("Patterson") appeals his convictions, following a jury trial, for Class D felony possession of cocaine[1] and Class A misdemeanor possession of a synthetic drug or a synthetic look alike substance.[2]

# Issues

1. Whether the trial court abused its discretion by overruling Patterson's *Batson* challenge to the State's peremptory challenge.

2. Whether sufficient evidence supports Patterson's convictions.

# Facts

[2] On May 3, 2014, around 9:00 a.m., Elkhart County Sheriff's Department Patrol Officer Shannon Stanfill ("Officer Stanfill") was driving his patrol car in Elkhart County when another oncoming vehicle, which was driven by Patterson, drove into the officer's lane of travel and nearly struck the officer's vehicle. Officer Stanfill, who also noticed that Patterson was not wearing a seatbelt, made a U-turn, activated his emergency lights, and stopped Patterson's car.[3]

---

[1] IND. CODE § 35-48-4-6(a). We note that, effective July 1, 2014, a new version of the possession of cocaine statute was enacted and that Class D felony possession of cocaine is now a Level 6 felony. Because Patterson committed his offense in May 2014, we will apply the statute in effect at that time.

[2] I.C. § 35-48-4-11.5(c).

[3] Officer Stanfill had video equipment in his vehicle and on his person, so the stop of Patterson's car was recorded. The video was admitted into evidence as State's Exhibit 2 and played for the jury. The record on appeal, however, does not contain a copy of the video because the trial court reporter did not include an Exhibit Volume when transmitting the Transcript.

[3] As Officer Stanfill walked toward Patterson's car, he noticed that the car's license plate was expired. When the officer got to the car, Patterson was in the driver's seat, Mark Turbin ("Turbin") was sitting in front passenger seat, and Reginald Crowder ("Crowder") was sitting in the rear passenger seat. The officer noticed that Crowder had an open alcoholic beverage container in between his feet.

[4] When Officer Stanfill checked the vehicle's registration, he learned that it was registered in the name of Gladys Dewey ("Dewey"). Patterson had purchased the car in November 2013 but had failed to register it in his name. Upon discovering that the car was not properly registered, the officer cited Patterson for the infractions of having a false registration and for failing to wear a seatbelt. Officer Stanfill told Patterson that the car would have to be impounded, and Patterson was "upset as anybody would be." (Tr. 107).

[5] The officer called for backup, and Elkhart Police Department Corporal Christopher Bella ("Corporal Bella") arrived at the scene. Officer Stanfill then had Patterson and the two other men exit the car, and he patted them down. When patting down Crowder, Officer Stanfill found a new glass pipe that "appeared to be a crack pipe[.]" (Tr. 130). At that point, the officer detained Crowder and informed Patterson and Turbin that they were "free to leave[.]" (Tr. 110).

[6] Before Officer Stanfill started to inventory the vehicle, he asked Patterson if he wanted to get anything out of the car, and Patterson responded that he did.

Patterson went to the front driver's side door and "collected some belongings and papers . . . out of the vehicle and put them in a grocery sack." (Tr. 110). Upon leaving the car, Patterson locked the front driver's side door.

[7] Officer Stanfill unlocked the car via the passenger-side door and started to inventory it. The officer found a clear baggie corner with a knot tied in it under the front driver's seat area near the center console. (Tr. 115). He then found two bags of "iBlown"[4] under the front driver's seat floor mat. Additionally, he found a piece of steel wool under the front passenger seat, which the officer testified was commonly used as a filter when smoking crack cocaine. Officer Stanfill arrested Patterson, who accused the officer of "plant[ing] the drugs" in his car. (Tr. 123). The substance in the baggie corner was later tested and determined to "contain [a] cocaine base" or more commonly referred to as crack cocaine. (Tr. 196). The substance in the iBlown package was later tested and determined to contain the synthetic drug "AB-FUBINACA." (Tr. 200).

[8] The State charged Patterson with Class D felony possession of cocaine and Class A misdemeanor possession of a synthetic drug or a synthetic look alike substance. The trial court held a two-day jury trial on February 5 and 6, 2015. During voir dire, the trial court asked the jury pool if anyone had any prior convictions, and Juror #5 stated that she had just been convicted of operating while intoxicated ("OWI") the preceding month and that she was on probation.

---

[4] "iBlown" is "a common manufactured name for a synthetic drug package that is in the shape of an I-phone[.]" (Tr. 116).

Juror #5 also indicated that she had been awake since the previous day and was tired. While Patterson's counsel was questioning the jury pool, Juror #4 stated that she was "kind of having an anxiety attack" and was having difficulty breathing. (Tr. 52).

[9] When Patterson's counsel questioned the jury pool about the concept that a person is innocent until proven guilty, he asked Juror #12 if she was "comfortable" with basing her verdict upon the evidence presented, and she responded, "I don't know. Sometimes I think that – I don't know." (Tr. 45). Patterson's counsel told Juror #12 that "there are certain rules and laws that . . . jurors ha[d] to follow" and then asked her if she would be "comfortable with the fact that [she] c[ould] only go on what is evidence when making [her] decision[,]" Juror #12 responded, "No." (Tr. 45). Juror #12 further stated:

> Well evidence is important but sometimes I don't know. I know you can't go back on the person's past of what has been in the past, you know what I mean, you have to go on what's the present now. It – and that's what I'm assuming that you have to do. What is present instead of the past so you have to . . .

(Tr. 45-46). Juror #12 also stated that she did not "like the idea that [she] ha[d] to see a person as guilty of something" and that she thought it was difficult to pass judgment on someone. (Tr. 46). She also stated that she did not "want to say a person has to go to jail you know and stuff and determine their [sic] – ah – their [sic] livelihood, you know, what their [sic] future's going to be and everything . . . It's kind of hard for me to be that sometimes you know what I

mean." (Tr. 46). After Patterson's counsel told Juror #12 that the trial court would determine any sentence, she responded:

> Yeah. But you know I might hold out if I think somebody's innocent or something like that. I might be and then I might not even change my mind you know that I mean. I say we'll [sic] you know that's just the way I feel and that's just the way it's going to be you know.

(Tr. 47).

[10] Following the conclusion of voir dire, the trial court held a bench conference to discuss any strikes that the parties had.[5] The following discussion occurred between the trial court and the parties:

> THE COURT: Well [the State is] challenging juror[] number 4, 5, and 12 for cause. Do you have any Mr. [Patterson]?
>
> [PATTERSON'S COUNSEL]: Could I find out what the cause is for? Do you know why [the State is] asking for cause?
>
> THE COURT: You realize you'll be removing all the Black jurors from this jury?
>
> [STATE]: I gave a reason, it had nothing to do with race and the reasons – I stated in my . . . inaudible – challenge for cause.

---

[5] The transcript contains the following notation: "(Bench conference held)." (Tr. 65). From the content of the transcribed discussion between the parties contained thereafter in the transcript, it appears that either some of the bench conference was not transcribed or that the State handwrote its reasons for cause on a paper that was then given to the trial court. Given the apparent incompleteness of the content of the bench conference during voir dire, Patterson should have prepared a verified statement of the evidence pursuant to Indiana Appellate Rule 31 to reconstruct the inaudible portions of the transcript that may have provided more clarity regarding the specific reasons for the State's challenges.

[PATTERSON'S COUNSEL]: Well I would object because I think – inaudible – you're not disqualified for being a jury – I think they both testified that they could not be an impartial juror and I think both of them could be fair and impartial jurors and I think it's pretextual.

THE COURT: Well [Juror #] 5 I don't know if she was asked about prior convictions.

[STATE]: You asked the whole jury about prior convictions and all she said was the OWI. I have the – I have the –

THE COURT: She did say she would have trouble staying awake.

(Tr. 65-66). The trial court then questioned Juror #5 about whether she "would be too sleepy to stay awake during th[e] trial[,]" and Juror #5 nodded her head in the affirmative. (Tr. 66).

[11] The trial court then ruled on the challenge to this juror, and the parties further discussed the State's challenges for cause:

THE COURT: I'll grant [the State's] challenge for cause on [Juror] number 5. Considering [Juror] number 4[,] you've got anxiety attack. I didn't hear any of that.

[STATE]: Didn't she say that to [Patterson's counsel] when [he] asked her a question about the pen?

[PATTERSON'S COUNSEL]: Yes. She said she was having an anxiety attack and I said – I think I said will you be okay and she said yes.

(Tr. 66). The trial court then questioned Juror #4, asking her if she would have difficulty serving on the jury because of her anxiety. After she responded that

she would, the trial court granted the State's challenge for cause and struck Juror #4.

[12] The trial court and the parties then discussed the State's challenge to Juror #12:

> THE COURT: . . . Number 11. That's the other Black juror. Well my notes say that [Juror] number 12 it was difficult to judge – ah – to not want anybody to go to jail, might hold out if she thought they were innocent. That's what I have.
>
> [STATE]: She also stated during the questioning of her that she couldn't just – she would need someone to prove they were telling the truth rather than waiting for them to give – rather than – an instruction telling the truth until they gave her a reason to – inaudible.
>
> THE COURT: I didn't pick up that comment in my notes.
>
> [PATTERSON'S COUNSEL]: Inaudible – any indication – inaudible.
>
> THE COURT: I'm going to deny cause. Do you still want the preempt?
>
> [STATE]: Does the Batson challenge still stand for the preemptory?
>
> THE COURT: What?
>
> [STATE]: Does the Batson challenge still stand for the preemptory strike?
>
> THE COURT: Well I'm saying you may have a potential issue there; you're removing all the Black jurors from the panel.
>
> [STATE]: Not without stating the reasons?

THE COURT: I'm sorry you what?

[STATE]: I would like to keep my preemptory strike.

\* \* \* \* \*

[PATTERSON'S COUNSEL]: Inaudible – show on the record that I continue my Batson challenge.

THE COURT: Okay. Batson actually applies when you show a pattern. We do have two being challenged, one for a valid cause and I've denied cause though the State is indicating that she would be unable to follow instructions which would not truly be a racial reason so I'll overrule [Patterson's] objection. The challenges stand. Inaudible.

[PATTERSON'S COUNSEL]: Okay.

(Tr. 67-68). The trial court then excused Juror #4, Juror #5, and Juror #12.[6]

[13]    During the trial, the State presented evidence regarding the facts of the offense as set forth above. The State also played State's Exhibit 2, Officer Stanfill's video footage of the stop.[7] Patterson's defense was that Crowder, who was seated in the back passenger seat, may have placed the drugs in the front driver's side of the car and under the front driver's side mat. The trial court instructed the jury on constructive possession, and the jury found Patterson guilty as charged.

---

[6] The trial court also excused Juror #11, but the record does not reveal the basis for her removal. Patterson does not challenge the removal of Juror #11 on appeal.

[7] Again, this exhibit and all other exhibits were not transmitted to this Court.

When sentencing Patterson, the trial court imposed concurrent sentences on his convictions. Specifically, the trial court imposed a 720-day sentence for Patterson's Class D felony possession of cocaine conviction and ordered it to be executed in the Department of Correction. For his Class A misdemeanor conviction, the trial court imposed a concurrent 360-day sentence and determined that this sentence had been satisfied by his time served. Patterson now appeals.[8]

# Decision

Patterson argues that: (1) the trial court erred by denying his *Batson* challenge; and (2) the State did not present sufficient evidence to support his two convictions.

## 1. *Batson* Challenge

Patterson first contends that the trial court erred by denying his challenge, alleging that the State had improperly exercised its peremptory challenge to strike an African-American juror from the potential jury pool in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).

---

[8] Before Patterson filed his Appellant's Brief, he sought a motion to stay the direct appeal and to remand for a hearing on a proposed verdict form for the lesser included offense of possession of a synthetic drug, and our Court granted the motion. The trial court held a hearing and had the trial court clerk re-certify the Clerk's Record. This verdict form is not at issue in this appeal.

[17] Our Indiana Supreme Court has set forth the following explanation of and standard of review for a *Batson* challenge:

> Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure. The exclusion of even a sole prospective juror based on race, ethnicity, or gender violates the Fourteenth Amendment's Equal Protection Clause.

> Pursuant to *Batson* and its progeny, a trial court must engage in a three-step process in evaluating a claim that a peremptory challenge was based on race. First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination. A step two explanation is considered race-neutral if, on its face, it is based on something other than race. Although the burden of persuasion on a *Batson* challenge rests with the party opposing the strike, the third step—determination of discrimination—is the "duty" of the trial judge. The trial court evaluates the persuasiveness of the step two justification at the third step. It is then that implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination. Also, at the third stage, the defendant may offer additional evidence to demonstrate that the proffered justification was pretextual.

> Upon appellate review, a trial court's decision concerning whether a peremptory challenge is discriminatory is given great deference, and will be set aside only if found to be clearly erroneous.

*Cartwright v. State*, 962 N.E.2d 1217, 1220-21 (Ind. 2012) (internal citations and quotation marks omitted).

[18]   Patterson acknowledges that steps one and two of the *Batson* analysis were without issue, thus acknowledging that the State had provided a race-neutral reason for striking Juror #12.  Instead, he raises a procedural-like challenge and contends that the trial court failed to comply with the third step of the *Batson* analysis.  Specifically, Patterson asserts that the trial court was "obligated to further inquire into the State's response with respect to Juror number twelve and that it should have questioned Juror #12.  (Patterson's Br. 10).  We disagree.

[19]   Patterson has misconstrued the third step in the *Batson* analysis.  Contrary to Patterson's assertion, the trial court is not required to engage in further investigation or to conduct "further meaningfully voir dire examination" of a juror.  (Patterson's Br. 12).  "At the third and last stage of a *Batson* inquiry, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." *Addison v. State*, 962 N.E.2d 1202, 1209 (Ind. 2012) (citations and internal quotation marks omitted).  "The issue [in the third *Batson* step] is whether the trial court finds the prosecutor's race-neutral explanation credible." *Id.* at 1210.[9]

---

[9] Our Indiana Supreme Court has explained that "'*[t]he State's* failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination.'" *Addison*, 962 N.E.2d at 1215 (quoting *Miller–El v. Dretke*, 545 U.S.

[20]     Here, the State sought to use a peremptory strike on Juror #12. From what has been transcribed in the transcript, it appears that the State sought to strike Juror #12 because she had made statements suggesting that she would be unable to follow the trial court's instructions. The trial court determined that the State's reason was race-neutral, and it denied Patterson's *Batson* challenge and made some additional "[i]naudible" remarks. (Tr. 68). While the transcribed portion of the trial court's ruling does not contain a statement indicating that the trial court specifically determined the State's proffered reason to be credible, we will infer that the trial court's ultimate denial of Patterson's *Batson* challenge to support such a determination, especially where Patterson "offered the trial court no reason to cast doubt on the State's explanation for the strike" and is challenging only the procedural aspect of the trial court's ruling in the third step of the *Batson* analysis. *See Addison*, 962 N.E.2d at 1210 (explaining that while it is technically "incorrect" for a trial court to "conflate" the second and third step of a *Batson* inquiry, the defendant had "offered the trial court no reason to cast doubt on the State's explanation for the strike").[10] *See also Ford v. State*, 704 N.E.2d 457, 461 (Ind. 1998) (explaining that an "[a]ppellant bears the burden of presenting a record that is complete with respect to the issues raised on

_____

231, 246 (2005)) (emphasis added) (additional citation and internal quotation marks omitted). There is, however, no requirement for the trial court to engage in such additional voir dire when ruling on a *Batson* challenge.

[10] In *Addison*, the defendant raised an appellate argument challenging the substantive nature of the trial court's ruling that he had not raised at trial (specifically arguing that the State's reason for striking the minority juror was pretextual because the voir dire record showed that non-minority venirepersons gave similar responses and were not stricken), and our supreme court reviewed the appellate argument under a fundamental error analysis. Here, however, Patterson makes no such appellate argument.

appeal"), *reh'g denied*; Ind. Appellate Rule 31(A) (providing a procedural method for an appellant to recreate the content of an argument or testimony from a trial where "no Transcript of all or part of the evidence is available").

**2. Sufficiency of Evidence**

Patterson argues that the evidence was insufficient to support his convictions for Class D felony possession of cocaine and Class A misdemeanor possession of a synthetic drug or a synthetic look alike substance.

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences *supporting* the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (internal quotation marks and citations omitted) (emphasis in original).

At the time of Patterson's crime, the possession of cocaine statute, INDIANA CODE § 35-48-4-6(a), provided that "[a] person who, without a valid prescription or order of a practitioner acting in the course of the practitioner's

professional practice, knowingly or intentionally possesses cocaine (pure or adulterated) . . . commits possession of cocaine . . . , a Class D felony[.]" Additionally, the possession of a synthetic drug or a synthetic look alike substance statute, INDIANA CODE § 35-48-4-11.5(c), provided that "[a] person who knowingly or intentionally possesses a synthetic drug or synthetic drug lookalike substance commits possession of a synthetic drug or synthetic drug lookalike substance, a Class A misdemeanor."

[23]    It is well-established that possession of an item may be either actual or constructive. *See Lampkins v. State*, 682 N.E.2d 1268, 1275 (Ind. 1997), *modified on reh'g*, 685 N.E.2d 698 (Ind. 1997). Constructive possession, which is applicable in this case, occurs when a person has: (1) the capability to maintain dominion and control over the item; and (2) the intent to maintain dominion and control over it. *Id.*

[24]    The capability element of constructive possession is met when the State shows that the defendant is able to reduce the controlled substance to the defendant's personal possession. *Goliday v. State*, 708 N.E.2d 4, 6 (Ind. 1999). Additionally, "[a] trier of fact may infer that a defendant had the capability to maintain dominion and control over contraband from the simple fact that the defendant had a possessory interest in the premises on which an officer found the item." *Gray v. State*, 957 N.E.2d 171, 174 (Ind. 2011). *See also Goliday*, 708 N.E.2d at 6 (explaining that "[p]roof of a possessory interest in the premises in which the illegal drugs are found is adequate to show the capability to maintain

control and dominion over the items in question") (quoting *Davenport v. State*, 464 N.E.2d 1302, 1307 (Ind. 1984), *cert. denied*).

The intent element of constructive possession is shown if the State demonstrates the defendant's knowledge of the presence of the contraband. *Goliday,* 708 N.E.2d at 6. A defendant's knowledge may be inferred from either the exclusive dominion and control over the premises containing the contraband, or if the control is non-exclusive, evidence of additional circumstances pointing to the defendant's knowledge of the presence of contraband. *Id.* These additional circumstances may include: "(1) a defendant's incriminating statements; (2) a defendant's attempting to leave or making furtive gestures; (3) the location of contraband like drugs in settings suggesting manufacturing; (4) the item's proximity to the defendant; (5) the location of contraband within the defendant's plain view; and (6) the mingling of contraband with other items the defendant owns." *Gray*, 957 N.E.2d at 175.

Patterson, contends that the evidence was not sufficient to support his two convictions, arguing that the State failed to prove that he had constructive possession of these two substances. Specifically, he contends that there were no "circumstances to show that he knew of the contraband or had an ability to control it." (Patterson's Br. 8). We disagree.

Turning to the capability element, we note that the evidence reveals that the drugs were found in Patterson's car that he was driving. Specifically, the drugs were found on the floor of the front driver's side—the cocaine was in a baggie

on the floor of the driver's side near the console and the synthetic drug was under the driver's floor mat. Patterson attempts to suggest that the evidence was "unclear" regarding what side of the car the drugs were found. (Patterson's Br. 14). Our review of the record reveals that Officer Stanfill testified that the drugs were found on the front driver's side. Patterson's challenge is nothing more than a request to reweigh the evidence and reassess the witness's testimony, which we will not do. *See Drane*, 867 N.E.2d at 146. From the evidence presented, the jury could have reasonably inferred that Patterson was able to reduce the contraband to his personal possession and that he, therefore, had the capability to maintain dominion and control over the items. *See Goliday*, 708 N.E.2d at 6; *Woods v. State*, 640 N.E.2d 1089, 1091 (Ind. Ct. App. 1994) (holding that the defendant had capability to maintain dominion and control over drugs found in the car he was driving and under the car seat where he was sitting).

[28] In regard to the intent element of constructive possession, Patterson suggests that there was not sufficient evidence to satisfy this element, arguing that he did not have exclusive control of the car because it had passengers; he did not make any furtive movements or incriminating statements; he did not attempt to flee; and the drugs were not in plain view.

[29] While there was no evidence of these specific additional circumstances, the State is not required to prove all additional circumstances when showing that a defendant had the intent to maintain dominion and control over contraband. *See Gee v. State*, 810 N.E.2d 338, 344 (Ind. 2004) (explaining that the additional

circumstances "are not exclusive" and that "the State is required to show that whatever factor or set of factors it relies upon in support of the intent prong of constructive possession, those factors or set of factors must demonstrate the probability that the defendant was aware of the presence of the contraband and its illegal character").

[30] Here, the evidence presented demonstrated the probability that Patterson was aware of the presence of the contraband. The State presented evidence that Patterson had owned the vehicle and had been the only person to drive the car since he bought it in November 2013. The State also presented evidence that the drugs were found in close proximity to Patterson, who had been driving the car. Specifically, the synthetic drug was under the front driver's floor mat, and the cocaine was in a knotted up baggie corner on the floor of the driver's side near the console. Officer Stanfill testified that the baggie corner indicated a potential for drug use. Additionally, the State presented evidence that one of the passengers had an unused glass pipe that could be used as a crack pipe; that a piece of steel wool, which was frequently used as a filter to smoke crack cocaine, was found under the front passenger seat; and that Patterson had a lighter on him. The evidence also showed that after Patterson had been allowed to return his car, he went to the front driver's side door, removed some items, and locked that door. Additionally, after Officer Stanfill arrested Patterson, he accused the officer of planting the drugs in the car. Officer Stanfill also testified that he did not see anyone, other than Patterson, access the driver's side front area of the car.

From this evidence, the jury could have reasonably determined that Patterson had the intent to maintain dominion and control and that he constructively possessed the contraband. *See, e.g.*, *Woods*, 640 N.E.2d at 1091 (explaining that "[c]onstructive possession of items found in a vehicle may be imputed to the driver of the vehicle" and affirming the defendant's possession of cocaine conviction where he was driving and the drugs were found under his seat); *Young*, 564 N.E.2d at 972 (holding that the evidence was sufficient to support an inference that the defendant, and not the passenger in the vehicle, had control over a spray can containing cocaine and was therefore in constructive possession). We will not reweigh the evidence or the jury's determination. *See Drane*, 867 N.E.2d at 146. Accordingly, we affirm Patterson's two convictions.

Affirmed.

Baker, J., and Bradford, J., concur.